J-S25033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: A.S.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M.D., MOTHER | : | No. 217 MDA 2020 |

Appeal from the Decree Entered January 3, 2020
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8963

| | | |
|---|---|---|
| IN THE INT. OF: Y.L.D. A/K/A Y.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M.D., MOTHER | : | No. 232 MDA 2020 |

Appeal from the Decree Entered January 3, 2020
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8964

BEFORE: LAZARUS, J., DUBOW, J., and KING, J.

MEMORANDUM BY KING, J.: **FILED JULY 27, 2020**

Appellant, D.M.D. ("Mother"), appeals from the decrees entered in the Luzerne County Court of Common Pleas, Orphans' Court, which granted the petitions of Children and Youth Services ("CYS") for involuntary termination of Mother's parental rights as to her minor children, A.S.M and Y.L.D. ("Children"). We affirm.

The relevant facts and procedural history of this case are as follows.

A.S.M. was born in June 2016. In August 2017, CYS became involved with the family following an incident in which Mother left A.S.M. outside of a bar while she went inside to drink. A.S.M. remained outside the bar for approximately twenty to twenty-five minutes until two bar patrons noticed A.S.M., took her into their vehicle, and drove off with her. Police conducted a traffic stop of the vehicle a short while later, and noticed A.S.M. sitting on one of the occupants' laps. Police immediately assumed protective custody of A.S.M. At the time of the incident, A.S.M.'s father was incarcerated. As a result, A.S.M. was placed in foster care on August 26, 2017, and later in kinship care with A.S.M.'s paternal grandmother ("Foster Mother").

Y.L.D. was born in May 2018. Due to Mother's non-compliance with her reunification plan for A.S.M., CYS sought and was granted an immediate shelter care order. CYS placed Y.L.D. with Foster Mother on May 9, 2018. Mother's family service plan required her to (1) complete parenting education courses; (2) complete a mental health evaluation and follow any recommendations; (3) submit to random urinalysis as requested by CYS and, if she tested positive, complete a drug and alcohol evaluation and follow any recommendations; and (4) engage in domestic violence counseling.

Mother sporadically participated in these services until August 2018, when Y.L.D.'s father shot Mother. Mother underwent nineteen surgeries and was hospitalized for approximately two months. The hospital discharged Mother in October 2018, but CYS could not locate Mother until July 19, 2019.

At this time, CYS notified Mother of Children's permanency review hearing scheduled for July 22, 2019. Mother did not attend the hearing, however, and CYS had no further contact with Mother until September 25, 2019. Mother then resumed her sporadic participation in the court-ordered services.

On November 7, 2019, CYS filed petitions for involuntary termination of Mother's parental rights to Children. As of CYS's filing, Mother had not completed the court-ordered services. The court conducted a termination hearing on January 2, 2020. At the hearing, CYS presented eight witnesses to testify regarding Mother's inconsistent and incomplete participation in the court-ordered services.

CYS first presented witnesses to discuss Mother's failure to complete her parenting education courses. Barbara Blanner, a case manager for the Family Service Association of Northeast Pennsylvania, testified that starting in October 2017, Mother completed an assessment and attended twelve sessions of the Intensive Family Reunification Program. (**See** N.T. Termination Hearing, 1/2/20, at 9-11). Ms. Blanner, however, stated that Mother did not consistently apply what she was taught in the program and did not demonstrate any real progress. (**Id.** at 11). Significantly, Mother did not find housing or employment, and did not fully engage with A.S.M. during her visits. (**Id.**). Ultimately, Mother did not complete the program and was "closed out" on February 23, 2018, after missing three sessions without rescheduling. (**Id.** at 9-11).

Concern Foster Care ("CFC") case manager, Sarah Kendricks, testified that Mother failed to complete a single lesson of her fifty-two week parenting education course. (*Id.* at 19). Ms. Kendricks revealed that Mother only participated in the initial evaluation and a follow-up discussion before she was "closed out" on June 12, 2018 for repeated no-shows. (*Id.* at 19-20). Fellow CFC case manager, Chyann Phillips, testified that although she informed Mother that CFC could help Mother engage in parenting services and file applications for housing and employment, Mother did not request such assistance. (*Id.* at 23). Instead, Ms. Phillips stated she only helped Mother acquire diapers and complete applications for the Head Start program. (*Id.* at 22). Ms. Phillips testified that she met with Mother three times through April and May of 2018, before Mother's case was closed for noncompliance. (*Id.* at 24).

CYS next introduced witnesses to discuss Mother's participation in mental health services. Maurissa Laudeman, a mental health counselor at Pathway to Recovery, testified that Mother's November 6, 2019 evaluation recommended that Mother attend individual counseling sessions twice a month to address her history of trauma. (*Id.* at 26-27). Mother, however, did not attend any of her scheduled appointments. (*Id.* at 27). The agency sent Mother an "at risk of discharge" letter on December 18, 2019, warning her that it would close her case in thirty days if she did not respond. (*Id.* at 28). As of the date of the termination hearing, Mother had not responded.

(*Id.*).

Deadra Clewell, the Northeast Regional Director for Omni Health Services ("OHS"), also testified regarding Mother's mental health. Ms. Clewell testified that Mother completed an intake session on May 15, 2018, and attended four sessions in the following months. (*Id.* at 33). Nevertheless, Ms. Clewell stated that Mother did not achieve any progress in her sessions and that OHS discharged Mother on August 30, 2018 for noncompliance. (*Id.* at 34-36).

Raina Cole, director of the intake department at Northeast Counseling Services ("NCS"), testified that Mother attended an initial intake appointment with NCS on December 14, 2017. (*Id.* at 39). Ms. Cole explained that Mother's plan required her to submit to a psychiatric evaluation with a doctor and to attend outpatient services. (*Id.* at 39). Mother completed the psychiatric evaluation on January 16, 2018, and the doctor diagnosed her with generalized anxiety disorder, alcohol use disorder, and opioid use disorder. (*Id.* at 40-41). Mother only attended one outpatient appointment, however, before NCS closed Mother's case on March 28, 2018, due to Mother's failure to communicate with the agency. (*Id.* at 40). Ms. Cole concluded that Mother did not make any progress through her limited participation with NCS. (*Id.* at 40-41).

CYS next introduced Allison Miller, a CYS caseworker, to discuss Mother's overall failure to comply with the court-ordered services.

Significantly, Ms. Miller testified regarding Mother's noncompliance with her drug and alcohol requirements, and her failure to pursue domestic violence counseling. Ms. Miller testified that Mother reported for only six (6) of her twenty-seven (27) scheduled urinalysis screenings. (*Id.* at 72). Ms. Miller explained that although Mother tested negative the six (6) times she did report, the other twenty-one (21) times she missed the screenings are considered positive results. (*Id.* at 73). Ms. Miller also explained that clients must initiate services for domestic violence counseling themselves. (*Id.* at 63). She testified that although a CYS caseworker spoke to Mother about domestic violence counseling, Mother did not contact a service center. (*Id.* 72). In sum, Ms. Miller testified that, "[a]ll the court-ordered services that were put into place for [Mother] to…remedy [the conditions] which led to placement have not been successfully engaged in or completed." (*Id.* at 68).

CYS's final witness testified regarding Children's relationship with Mother and Foster Mother. Sherry Grenzberg, a former CYS caseworker, testified that Children have assimilated into Foster Mother's home and that Foster Mother is willing to adopt them. (*Id.* at 89). Ms. Grenzberg explained that Foster Mother meets the physical, developmental, and emotional needs of Children. (*Id.* at 89-90). She claimed Y.L.D. is "very bonded" to Foster Mother. (*Id.* at 93). Although Ms. Grenzberg acknowledged that A.S.M. is bonded to Mother, she believed termination of Mother's parental rights would be positive for both Children, because Foster Mother "offers the opportunity

for [Children] to have a safe and stable environment to grow in." (*Id.* at 95). Ms. Grenzberg also stated Children's bond with Foster Mother is stronger than their bond with Mother. Ms. Grenzberg conceded that there can be an element of "emotional trauma" for children in termination cases, but she maintained that severance "may allow [A.S.M.] to move on and to be able to find normalcy and have a permanent bond." (*Id.* at 96).

Mother also took the stand and testified on her own behalf. She stated that before being shot, she was working on the court-ordered services and intended to continue her progress. (*Id.* at 78-79). After she was discharged from the hospital, Mother claimed she did not contact CYS because "[she] was…trying to rehabilitate [herself] and recover." (*Id.* at 80). Mother also testified that she tried "a couple of times" to contact CYS via phone calls, but that no one answered or responded to her voicemails. (*Id.*). Although Mother acknowledged that her absence from October 2018 through July 2019 "probably…hurt" A.S.M., she rationalized that "it wasn't [her] fault that [she] couldn't visit" because she was recuperating from "a violent situation." (*Id.* at 85). Furthermore, Mother admitted she does not have a "close" relationship with Y.L.D., but testified that she has a "very close" relationship with A.S.M. (*Id.* at 83). Mother stated that A.S.M. would be "very hurt" if Mother's rights were terminated. (*Id.*). Nevertheless, Mother agreed that Children were being well taken care of by Foster Mother. (*Id.* at 85).

At the conclusion of the hearing, the court determined that CYS proved

all necessary elements of 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). Consequently, the court terminated Mother's parental rights to Children.[1] On January 31, 2020, Mother timely filed separate notices of appeal and concise statements of errors complained on appeal.[2] This Court consolidated *sua sponte* Mother's appeals on March 2, 2020.

Mother raises the following issue for our review:

> Whether the [c]ourt erred in finding that [CYS] proved the elements of 23 Pa.C.S.A. § 2511(a)(2), (5), and (8), and 23 Pa.C.S.A. [§] 2511(b) through clear and convincing evidence?

(Mother's Brief at 5).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

---

[1] The court also terminated the parental rights of the natural fathers of both Children. The natural fathers are not parties to this appeal.

[2] Mother included both underlying trial court docket numbers on each notice of appeal, in violation of **Commonwealth v. Creese**, 216 A.3d 1142 (Pa.Super. 2019). This Court has recently overruled **Creese**, however, to the extent that it required the Superior Court to quash appeals when an appellant files multiple notices of appeal and each notice lists all of the appealed from docket numbers. **See Commonwealth v. Johnson**, ____ A.3d ____, 2020 PA Super 164 (filed July 9, 2020) (*en banc*). Thus, Mother's notices of appeal are properly before us. In light of this Court's *en banc* decision in **Johnson**, we lift the stay order entered on June 25, 2020.

- 8 -

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972

A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d

1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165

(2008)).

CYS filed petitions for the involuntary termination of Mother's parental rights to Children on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

>    **(b)   Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

* * *

23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions."  *In re Z.P., supra* at 1117.  When conducting a termination analysis:

>    Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of…[her] parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

On appeal, Mother argues the court failed to properly consider her extraordinary circumstances and her progress towards remedying the conditions which led to Children's placement.  Mother claims she participated

in court-ordered services throughout the life of this case and was actively engaged in addressing CYS's concerns until Y.L.D's father shot her in August 2018. Mother avers her resulting hospitalization halted her progress. Mother, however, maintains that she re-engaged with services after reconnecting with CYS in September 2019. Furthermore, Mother contends CYS did not provide timely referrals, which prevented her from completing her parenting education requirement. Additionally, Mother attests that there are no current concerns with her parenting, as testimony established that her visits were appropriate. Mother insists that her efforts in light of her situation were reasonable and CYS, therefore, could not demonstrate that she refused to remedy any incapacity in her parenting.

Moreover, Mother maintains termination of her parental rights is not in Children's best interests. Mother asserts that it is undisputed that Mother and A.S.M. share a strong bond, highlighting testimony that A.S.M. was visibly upset when separated from Mother and that A.S.M. would experience "emotional trauma" if Mother's rights were terminated. Mother argues the CYS caseworker, Ms. Grenzberg, was not qualified to compare Mother's and Foster Mother's bonds with Children as Ms. Grenzberg did not personally witness Children's interactions with Mother. Mother concludes the trial court erred in terminating her parental rights, because it lacked clear and convincing evidence that the statutory grounds for termination were met under 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). We disagree.

"The bases for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.B.*, 990 A.2d 762, 771 (Pa.Super. 2010). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002). Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist;

and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts CYS supplied over a realistic time. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of CYS's services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not

required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

**In re Z.P., supra** at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have…her rights terminated." **In re B.L.L.**, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert [herself] to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of

- 15 -

> maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with…her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of…her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

Instantly, the record supports the court's decision to terminate Mother's parental rights to Children under Section 2511(a). A.S.M. and Y.L.D. have been in foster care since August 2017 and May 2018, respectively. At the time of the termination hearing, Children had been removed from Mother's care for over two years. While Children remained in foster care, Mother failed to complete the court-ordered services relating to parenting, mental health, drug and alcohol, and domestic violence issues. Although Mother initiated services with various agencies, Mother's sporadic and limited participation prevented her from making any progress. Mother also failed to apply the techniques she was taught even while actively attending the programs. Despite being given ample time to address CYS's concerns, Mother did not complete or benefit from any of the required services. Consequently, Mother failed to remedy the conditions that led to Children's placement. Accordingly,

we agree that termination was appropriate pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8).

As well, the record supports the court's decision to terminate Mother's parental rights under Section 2511(b). Children are bonded with Foster Mother and rely on her to fulfill their physical, developmental, and emotional needs. Y.L.D. particularly exhibited a close emotional attachment to Foster Mother. Both Ms. Grenzberg and Mother testified that Y.L.D. is not bonded to Mother. While some testimony indicated that A.S.M. is bonded to Mother, Ms. Grenzberg emphasized that termination would ultimately further A.S.M.'s best interests, as it would allow her to establish a healthier, permanent bond with Foster Mother, who plans to adopt Children. *See In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa.Super. 2015) (affirming termination decision where court acknowledged that Mother and Child were bonded, but reasoned that termination would not be detrimental to Child and would serve Child's best interest and allow Child to find permanency with another family); *In re N.A.M.*, 33 A.3d 95 (Pa.Super. 2011) (explaining mere existence of emotional bond does not preclude termination of parental rights). As the record supports the court's conclusions under Sections 2511(a) and (b), we see no reason to disturb its decision to terminate Mother's parental rights. *See In re Adoption of K.J., supra*. Accordingly, we affirm.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>07/27/2020</u>